**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.

**UNIVERSITY OF MIAMI,**

    **Plaintiff,**

vs.

**OLIVIA COLBERT,**

    **Defendant.**
_____/

## COMPLAINT

Plaintiff, University of Miami ("University"), by and through undersigned counsel, for its complaint against Defendant, Olivia Colbert (formerly Olivia Osborne) ("Colbert"), alleges as follows:

## INTRODUCTION

1. The University of Miami is a highly ranked world class university involved in significant academic research. As is common for university-supported research, the University, pursuant to its published policies and procedures, owns the inventions made by its students, employees and faculty and owns the inventions and innovations made or developed using University facilities, on University time and/or through the aid of University information not available to the public. The purpose of the ownership is to assist and support University students, employees and faculty in the commercialization of intellectual property while still supporting the academic mission of the University and to benefit the public at large.

2. This is an action by the University to protect its legal and equitable rights in a software application invention developed by a former student using University resources within the scope of her academic research obligations. The application software, known as "NeurOn

Therapeutics," was created by Colbert while she was enrolled in a graduate program at the University and engaged in research supported by University facilities, personnel and funding.

3. Under the University's long standing, published Intellectual Property Policy, students and employees who develop inventions using University resources or in connection with their University work are required to disclose such inventions and assign their rights to the University. Colbert failed to comply with these obligations, despite the software being related to and arising out of her research activities, recruiting other University students for development support, utilizing faculty mentorship and receiving University-sponsored funding.

4. Despite repeated opportunities and good faith efforts by the University to resolve the dispute amicably, Colbert has refused to acknowledge the University's ownership rights or assign her interest as required. She continues to treat NeurOn Therapeutics as privately owned intellectual property, omitting any reference to the University's role or contribution, including on marketing materials and a publicly accessible website.

## PARTIES AND JURISDICTION

5. Plaintiff University is a Florida non-profit corporation with a principal place of business located at 1320 South Dixie Highway, Suite 1200, Coral Gables, Florida 33146.

6. Defendant Colbert is an adult individual and is currently a resident of the State of Florida.

7. This court has subject matter jurisdiction under the Lanham Act, 15 U.S.C. §§ 1051 et seq., 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a) (trademark) and jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

8. This Court has personal jurisdiction over Defendant because she resides in Miami-Dade County, Florida, and the acts alleged in this Complaint were committed in Miami-Dade County, Florida.

9. Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391 (b) and (c) because Colbert resides in this judicial district and the events giving rise to these claims occurred within this judicial district.

## GENERAL ALLEGATIONS

10. The University is a non-profit private research institution, located in Coral Gables, Florida, comprised of twelve (12) schools and colleges serving undergraduate and graduate students in more than one hundred and eighty (180) majors and programs.

11. Having been established 100 years ago, the University has enjoyed a long and celebrated history of academic excellence, known throughout the nation and world. The University has been recognized as among the top-tier national universities in the country, including its graduate school programs.[1] Included in this recognition is the University's medical school, responsible for numerous breakthroughs and advancements in the field of medicine, as well as the University's prestigious schools of engineering and law.[2]

12. The University has received numerous other accolades over the years, on state, national and international levels, for its laudable contributions to academia and scientific/intellectual advancement. The University plays a vital role in advancing research and development in the Miami-Dade metropolitan areas, the state of Florida, the nation and the world.

---

[1] *University of Miami,* U.S. NEWS & WORLD REPORT, https://www.usnews.com/best-colleges/university-of-miami-1536. (last visited August 5, 2025).
[2] *University of Miami's Graduate School Rankings,* U.S. NEWS & WORLD REPORT, https://www.usnews.com/best-graduate-schools/university-of-miami-135726/overall-rankings. (last visited August 5, 2025).

13. The University encourages student and faculty inventions and innovations. Due to the numerous inventions and innovations created by University faculty and students, the University has policies and procedures in place pertaining to inventions, intellectual property and technology transfers ("University IP Policy"). *See* Exhibit A, excerpt from the University's Faculty Manual relating to Inventions, Intellectual Property and Technology Transfer ("University IP Policy").

14. The Inventions, Intellectual Property and Technology Transfer excerpt referenced above also is highlighted and incorporated into the Graduate Student Handbook for the University of Miami Graduate School.

15. Section I, paragraph 1.1 of the University IP Policy states, in pertinent part:

> Although the University does not undertake research or developmental work principally for the purposes of commercialization, patentable inventions and other works with commercial application may result from activities carried out by Applicable Personnel. The University has an obligation to appropriately develop innovations to both benefit the public and generate resources that further support the academic mission of the University…

*See* Exh. A.

16. The University IP Policy defines "Applicable Personnel" as "all full- and part-time faculty, staff and employees, students, fellows and non-employees who use University funds, facilities or other resources, or participate in University-administered research, including visiting faculty and industrial personnel, regardless of obligations to other companies or institutions." *See* Exh. A, Sec. II.

17. The University IP Policy defines "Innovations" as:

> [P]atentable or un-patentable inventions, discoveries, processes, compositions, research tools, data, ideas, databases, know-how, copyrightable works that are not scholarly or artistic Creations and tangible property, including biological organisms, engineering prototypes, drawings, and software created, conceived or made by Applicable Personnel within their normal duties (including clinical duties), course of

studies, field of research or scholarly expertise or making more than Incidental Use of University's resources.

*See* Exh. A, Sec. II.

18. Innovations are owned by the University. *See* Exh. A, ¶ 3.3. The University IP Policy also states that "Applicable Personnel are required to assign and hereby do assign to the University all Innovations." *Id.* at ¶ 3.3(a). Notwithstanding, the University shares the revenue derived from the commercialization of Innovations with the Applicable Personnel, as set forth in the University IP Policy. *Id.* at ¶ 3.3.

19. To allow the University to assist in the discussion about and guidance towards commercial potential, Applicable Personnel are required to submit their Innovations to the University's Office of Technology Transfer ("OTT") at least 45 days prior to public disclosure. *See* Exh. A, ¶ 5.1(b).

20. Beginning in August 2020, Colbert was a Ph.D. student at the University's Miller School of Medicine in the field of Biochemistry and Molecular Biology and recently graduated in the Spring of 2025. A major part of Osborne's Ph.D. research was related to post-stroke recovery. Osborne presented her dissertation seminar on January 29, 2025. Her dissertation was titled, "The Molecular Basis of Blood-Braid Barrier Dysfunction and Impaired Neurogenesis in CAA[3]-Related Stroke."

21. In 2023, Colbert, while a student at the University and using University resources, invented a mobile software application, called "NeurOn Therapeutics," that delivers cognitive

---

[3] Cerebral amyloid angiopathy.

rehabilitation exercises.[4] Colbert assembled a group of undergraduate computer science students from the University to code the NeurOn Therapeutics prototype.

22. On or about June 21, 2023, Colbert and her husband, Brett Colbert, (the "Colberts") met with Dr. Norma Kenyon, the interim director of OTT at the time, and Peter Gutenberg, Senior Licensing Associate at the OTT, regarding NeurOn Therapeutics. During this meeting, Colbert claimed that she and her husband utilized their own resources and funds for the invention and did not make more than mere incidental use of the University's resources for the invention.

23. On or about July 28, 2023, based on the information provided by Colbert, Tiffany-Ashley Disney, a Licensing Associate at the OTT, emailed two draft Memoranda of Understanding "MOU" to the Colberts, which stated that the University would not have an ownership interest in NeurOn Therapeutics and that NeurOn Therapeutics was not subject to the University IP Policy. The MOUs had to be signed by the Colberts, Whitney Hough (the Director of OTT) and Sylvia Daunert, Olivia Colbert's department chair.

24. Dr. Daunert was unwilling to sign the MOU as written, as NeurOn Therapeutics did relate to Colbert's course of studies, field of research and scholarly expertise. Dr. Daunert also approached Dr. Michal Toborek, Colbert's research professor, regarding the MOU. Dr. Toborek also was concerned that there was a clear relationship between Colbert's Ph.D. studies and NeurOn Therapeutics.

25. On or about September 1, 2023, Dr. Kenyon emailed the Colberts requesting that they complete an Innovation Invention Disclosure for NeurOn Therapeutics through the University's Innovation Disclosure online platform.

---

[4] Colbert also created NeurOn Therapeutics along with her husband, Brett Colbert, who is currently a M.D./Ph.D candidate at the University's Miller School of Medicine.

26. On or about September 6, 2023, the Colberts submitted to the University the Innovation Invention Disclosure Form for NeurOn Therapeutics (UMIP-885) ("Invention Disclosure"). *See* Exhibit B, Invention Disclosure, Invention No. UMIP-885.

27. The University IP Policy states that "Applicable Personnel will cooperate with the OTT in its efforts to evaluate, protect and transfer Innovations, including executing documents and taking other actions as reasonably requested by OTT." *See* Exh. A, ¶ 5.2(c).

28. Upon receiving the Invention Disclosure, the University/OTT discovered new information regarding NeurOn Therapeutics that Colbert failed to previously disclose.

29. For example, the Invention Disclosure stated that the Colberts recruited undergraduate computer science students at the University to code the mobile application for NeurOn Therapeutics as early as April 2022. *See* Exh. B, p. 3.

30. Additionally, the Invention Disclosure, which was submitted on September 9, 2023, stated that NeurOn Therapeutics had been coded and people were using it. *See* Exh. B, p.3. This is in contravention of the University IP Policy, which states that "disclosure should occur at least 45 days prior to public disclosure of the Innovations…." *See* Exh. A, ¶ 5.1(b).

31. The Invention Disclosure also did not include the website for NeurOn Therapeutics or any information about when the website was created/made available to the public.

32. The Colberts also failed to sign the Invention Disclosure. By signing the Invention Disclosure, the Colberts would have declared that the statements made in the Invention Disclosure were true and accurate and would have agreed to cooperate with OTT "in the protection and commercialization of this Creation/Innovation." *See* Exh. B, pp. 6-7. Further, signing the Invention Disclosure would assign all rights, title and interest in NeurOn Therapeutics to the University. *See id.*

33. Not only was the Invention Disclosure submitted by the Colberts missing information, but it also was extremely vague, requiring OTT to investigate further into the statements made. For example, the Invention Disclosure asked: "Was this Creation/Innovation supported or funded in any way through a philanthropic gift? If yes, please provide details." The answer listed, "Yes, Jonathan Rothberg." *See* Exh. B, p. 2.

34. OTT had to investigate further into the Colberts' statements regarding this philanthropic gift and learned that, in May 2023, the Colberts won the Jonathan Rothberg Catalyzer Award and secured $5,000 in funding in a University of Miami Startup Competition for the NeurOn Therapeutics prototype.

35. Once the University investigated further into NeurOn Therapeutics, it discovered that its LinkedIn page indicates that NeurOn Therapeutics was founded in 2022. *See* Exhibit C, NeurOn Therapeutic's LinkedIn profile, "About" Section.

36. Additionally, a search of the NeurOn Therapeutics' website (https://www.neurontherapy.io/) on the Wayback Machine Internet Archive indicates the earliest snapshot of the website to be dated September 25, 2023.[5]

37. Colbert was well aware of the OTT, University IP Policy and its procedures relating to inventions, intellectual property and technology transfer. According to Ms. Osborne's LinkedIn page, she interned at the OTT for two years, from June 2021 through June 2023, and "review[ed] and draft[ed] […] agreements related to research and technology licenses, create[ed] one pagers of potential technologies, analyz[ed] the protectability, commercial/market potential, and regulatory path of new cutting-edge technologies from across University of Miami, m[et] with

---

[5] Wayback Machine, https://web.archive.org/web/20250000000000*/https://www.neurontherapy.io/ (click "2023").

inventors and performing patent literature searches, create[ed] technology presentations for PI's and stakeholders." *See* Exhibit D, LinkedIn Page of Olivia (Osborne) Colbert.

38.     On September 18, 2023, Dr. Hough (Director of OTT), interviewed the Colberts regarding NeurOn Therapeutics and their Invention Disclosure. During the interview, they explained to Dr. Hough that NeurOn Therapeutics is a cognitive rehabilitation software application, particularly providing cognitive exercises for brain injury patients, including stroke patients via a web-based application and direct text messages. They advised Dr. Hough that the application had been deployed, people have been using the application and they have been fixing the bugs/issues along the way.

39.     On September 19, 2023, Dr. Hough spoke with Dr. Toborek (Colbert's professor/mentor for her research) regarding NeurOn Therapeutics. Dr. Toborek explained that there was a clear relationship between Colbert's Ph.D. research studies and NeurOn Therapeutics because Osborne's research in his lab is related to strokes and stroke recovery.

40.     The University promoted and supported Colbert in her entrepreneurship endeavors with NeurOn Therapeutics, as it does with all of its students and faculty. In December 2023, the University published an article on the University of Miami Miller School of Medicine website titled, "Graduate Student Creates App to Aid Brain Recovery." *See* Exhibit E, 12/18/2023 Article. The article explains that Colbert's research at the University "has led to a better understanding of how stroke affects the brain and its recovery process while also creating NeurOn Therapeutics, an app that allows users to take back control of their cognitive health." *See id*. The article also provides a link to the NeurOn Therapeutics website. *See id.* Additionally, there is a photo in the

article of Colbert wearing a lab coat with the University Miami Miller School of Medicine logo and a patient using the NeurOn Therapeutics app while in a University clinical lab.[6] *See id.*

41. On January 11, 2024, Dr. Hough emailed the Colberts regarding the Invention Disclosure of NeurOn Therapeutics (UMIP-885), advising that NeurOn Therapeutics is subject to the University IP Policy and the University has ownership claims as to NeurOn Therapeutics because the Colberts are "Applicable Personnel" and "created, conceived, or made the disclosed intellectual property within [their] course of studies, field of research, and scholarly expertise." *See* Exhibit F, 01/11/2024 email.

42. In an effort to find a solution to the violation of University IP Policy, Dr. Hough's email proposed "a license agreement that does not include royalties, milestone, or development fees but includes (1%) present non-diluting equity." *See id.* This means that the University will receive 1% equity if NeurOn Therapeutics is acquired.

43. On January 17, 2024, the Colberts emailed Dr. Guillermo "Willy" Prado, Interim Executive Vice President and Provost of the University, appealing the OTT decision from January 11, 2024. *See* Exhibit G, 01/17/2024 Appeal Email. In the email, the Colberts cite University IP Policy Section 3.4, and argue that NeurOn Therapeutics was not "made or developed with more than Incidental Use of University resources and not within normal duties (including clinical duties), course of studies, field of research and scholarly expertise of Applicable Personnel," and therefore, belongs to the Colberts.

---

[6] In the Spring of 2024, the University released a similar article regarding Colbert and NeurOn Therapeutics titled, "Exploring Brain Pathway Connections – A graduate student's platform aid in recovering cognitive health." This was published in the University Miami Medicine Magazine. *See Exploring Brain Pathway Connections,* University of Miami Medicine Magazine, https://magazine.med.miami.edu/exploring-brain-pathway-connections/. (last visited June 6, 2025).

44. On October 8, 2024, Dr. Prado sent a letter to the Colberts denying their appeal from the determination of the Office of Technology Transfer regarding NeurOn Therapeutics. *See* Exhibit H, 10/08/2024 Letter from Dr. Prado. Dr. Prado advised in the letter that the denial was based on the University IP Policy and discussions he had with the Colberts, Drs. Kenyon, Daunert and Toborek. *See id*. Additionally, Dr. Prado mentioned in his letter that during his comprehensive review of the case, the University discussed demanding 100% equity of NeurOn Therapeutics. *See id.*

45. Dr. Prado further stated that the University's proposal that it receive 1% equity in NeurOn Therapeutics remained on the table and clarified that "no royalties or other fees would be charged, and the University of Miami would only benefit if the company were acquired. Whatever revenue is received is shared with the inventors, the departments, and the University." *See* Exh. H.

46. After Dr. Prado's letter, on November 8, 2024, the University sent the Colberts a draft agreement setting forth the parties' equity/rights in the intellectual property of NeurOn Therapeutics.

47. The University has made repeated efforts to resolve the dispute and secure its assignment of rights/ownership of NeurOn Therapeutics, which Colbert has ignored or rejected.

48. To date, the Colberts have yet to sign the agreement and continue to improve and use the NeurOn Therapeutics software application in the public domain. The NeurOn Therapeutic's website (neurontherapy.io) displays the notice: "© 2024 NeurOn Therapeutics, Inc. All rights reserved." *See* Exh. I, Homepage of the NeurOn Therapeutics website. Nowhere on the website does it acknowledge the University's ownership interest in NeurOn Therapeutics.

49. Further, Colbert has refused to recognize the University's ownership rights in the intellectual property of NeurOn Therapeutics.

50. Colbert's actions have given the University no choice but to take legal action to enforce its ownership rights in the NeurOn Therapeutics application software, to which it is entitled under the University IP Policy.

51. All conditions precedent to the maintenance of this action have been performed and/or exhausted by the University, have occurred or have been waived.

52. The University has retained the undersigned law firm to protect and prosecute its interests herein. The University has agreed to pay the undersigned law firm a reasonable fee for its services.

## **COUNT I: FALSE DESIGNATION OF ORIGIN**
### **(Lanham Act § 43(a), 15 U.S.C. § 1125(a))**

53. The University incorporates by reference and re-alleges paragraphs 1 through 52 above as fully set forth herein.

54. The University is the rightful owner of the NeurOn Therapeutics mark and software application because it was created, conceived and made by University students, within their normal duties (including clinical duties), course of studies, field of research or scholarly expertise and made with more than Incidental Use of University resources and, thus, an "Innovation" under the University IP Policy.

55. Since its creation, the NeurOn Therapeutics mark and software application has been associated with the University's academic mission and research initiatives including, but not limited to, participation in a University-administered startup competition (which provided funding for the application), faculty mentorship, collaborative development involving undergraduate University computer science students and the University's own media publication efforts.

56. Without permission, authority or license from the University, NeurOn Therapeutics launched a website, posted marketing materials, including a LinkedIn page, claiming NeurOn

Therapeutics as proprietary property and presenting the application as the work of a private company without attribution to the University or acknowledgment of its development origins. Colbert personally took part in these infringing activities and specifically directed others to do so.

57. NeurOn Therapeutics' public representations, including a copyright notice ("© 2024 NeurOn Therapeutics, Inc. All rights reserved") and its omission of the University's role in development, falsely suggest that NeurOn Therapeutics is the original and exclusive source of the NeurOn Therapeutics application software.

58. These acts constitute a false designation of origin and/or false representation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and are likely to cause confusion or mistake as to the affiliation, connection, or association of NeurOn Therapeutics with the University, or as to the origin, sponsorship, or approval of NeurOn Therapeutics.

59. Colbert's conduct has been willful, knowing and with the intent to deceive the public and misappropriate the goodwill and reputation of the University. Despite multiple notices from the University's OTT, including formal communications indicating University ownership and a proposed license agreement, Colbert has refused to recognize or formalize the University's rights, all while continuing public use of the NeurOn Therapeutics intellectual property including, but not limited to any trademarks rights.

60. Upon information and belief, by her acts, Colbert has made and will make substantial profits and gain to which she is not entitled in law or equity.

61. As a direct and proximate result of Colbert's wrongful conduct, the University has suffered and continues to suffer irreparable harm to its academic and institutional reputation, loss of control over the branding and direction of the application software, and the unauthorized

dilution of its goodwill and intellectual property portfolio in accordance with the University's academic mission.

63. Colbert's wrongful acts will continue unless enjoined by this Court.

## COUNT II: BREACH OF CONTRACT

63. The University incorporates by reference and re-alleges paragraphs 1 through 52 above as fully set forth herein.

64. By enrolling as a Ph.D. student at the University, Colbert entered into an agreement with the University and agreed to abide by the Graduate Student Handbook, particularly, the University's Policy on Inventions, Intellectual Property and Technology Transfer ("University IP Policy"), whereby Colbert agreed that she would assign innovations made within her normal duties (including clinical duties), course of studies, field of research or scholarly expertise. *See* Exh. A.

65. By enrolling as a student at the University, Colbert also agreed to timely disclose inventions and innovations to the University and cooperate with the University's OTT in its efforts to evaluate innovations, including executing documents and taking other actions as reasonably requested by OTT. *See* Exh. A, ¶¶ 5.1(b) and 5.2(c).

66. While enrolled as a Ph.D. student at the University, Colbert developed the NeurOn Therapeutics software using University resources, including the recruitment of University students, faculty mentorship, funding from a University-administered startup competition, and lab facilities associated with the University.

67. Colbert materially breached the University IP Policy by:

   a. Failing to assign the rights of NeurOn Therapeutics to the University;

   b. Failing to timely disclose NeurOn Therapeutics to the University;

    c. Submitting a deficient Innovation Disclosure form that omitted critical information, failed to include a required signature, and refused to formally assign rights to the University;

    d. Continuing to commercialize and publicly use the NeurOn Therapeutics software; and

    e. Denying the University's ownership interest.

68. As a direct and proximate result of Colbert's breach, the University has suffered damages including loss of its rightful intellectual property, diminished control over academic and research outputs, reputational harm, and lost commercialization opportunities.

### COUNT III: COMMON LAW UNFAIR COMPETITION

69. The University incorporates by reference and re-alleges paragraphs 1 through 52 above as fully set forth herein.

70. Colbert has wrongfully and intentionally appropriated for her own use the NeurOn Therapeutics software, which was developed by students of the University, using the University's resources, within the scope of their academic duties and subject to the University's Policy.

71. Colbert has publicly marketed, distributed and represented the NeurOn Therapeutics software as her own original work, without acknowledging the University's ownership or the University's role in its development and funding.

72. Such conduct is likely to cause confusion among the public, investors and potential collaborators as to the source, sponsorship and ownership of the NeurOn Therapeutics trademark and application software.

73. Colbert's actions were undertaken willfully and in bad faith, with full knowledge of the University's rights and policies and in a deliberate attempt to misappropriate and profit from the goodwill, reputation and proprietary work of the University.

74. As a direct and proximate result of Colbert's unfair competition, the University has suffered and will continue to suffer damage to its reputation and loss of control over its intellectual property.

## ALTERNATIVE COUNT IV: UNJUST ENRICHMENT

75. This Count IV is in the alternative to Count II above.

76. The University incorporates by reference and re-alleges paragraphs 5-12 and 20-21 above as fully set forth herein.

77. The University conferred substantial benefits upon Colbert through financial support, access to research laboratories, mentorship from faculty, access to University students for technical development, and institutional backing for entrepreneurial efforts related to the development of the NeurOn Therapeutics software.

78. Colbert voluntarily accepted and retained these benefits to create, develop and market NeurOn Therapeutics.

79. As a result, Colbert has been unjustly enriched through the use of University resources and intellectual capital for her own benefit and to the detriment of the University.

80. Under these circumstances, it would be inequitable to allow Colbert to retain the benefit conferred on her by the University.

## COUNT V: NEGLIGENT MISREPRESENTATION

81. The University incorporates by reference and re-alleges paragraphs 1 through 52 above as fully set forth herein.

82. At all relevant times, Colbert was a graduate student at the University of Miami and subject to the University IP Policy, which requires disclosure of inventions and assignment of intellectual property developed using more than incidental University resources or in connection with the student's field of research, course of study or academic duties.

83. By virtue of her enrollment and participation in University research, and through her internship with the University's Office of Technology Transfer ("OTT"), Colbert was in a position of trust and had actual knowledge of the University's intellectual property disclosure obligations, the invention reporting process, and the consequences of failing to disclose such information truthfully and timely.

84. Colbert had exclusive knowledge regarding the development of the NeurOn Therapeutics software application, including the recruitment of University students for technical development, the use of University resources and funding and the connection of the software to her dissertation research and academic field.

85. Despite this knowledge, Colbert, at a minimum, negligently misrepresented and omitted key information in communications with University representatives, including during a June 21, 2023 meeting with the OTT and in the Invention Disclosure Form she submitted on or about September 6, 2023. These misrepresentations included:

(a) Falsely asserting that NeurOn Therapeutics was developed without more than incidental use of University resources;

(b) Omitting the fact that NeurOn Therapeutics had already been deployed and was in use by third parties;

(c) Failing to disclose the involvement of University undergraduate students in the software's development;

(d) Omitting the source and timing of public exposure, including the launch of a website and LinkedIn presence; and

(e) Submitting an incomplete and unsigned Invention Disclosure Form, which did not fully assign the invention or acknowledge the University's ownership interest.

86. These misrepresentations and omissions were material and induced the University to initially consider a Memorandum of Understanding that disclaimed ownership and delayed appropriate action to protect its rights.

87. Colbert knew or should have known that such omissions and misstatements would mislead the University and cause it to delay asserting its ownership interests in the NeurOn Therapeutics software application.

88. As a direct and proximate result of Colbert's negligent misrepresentation and omissions, the University has suffered damages, including but not limited to: loss of potential equity interest in NeurOn Therapeutics, diminished ability to control or license its intellectual property, reputational harm, legal and investigatory expenses, lost revenue, lost business reputation and lost commercialization opportunities.

## PRAYER FOR RELIEF

WHEREFORE, the University demands judgment against Colbert as follows:

1. Find Colbert violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and:

    a. Award damages, including actual damages and profits derived by Colbert from the unauthorized use of the NeurOn Therapeutics intellectual property, including but not limited to the trademark.

    b. Treble such damages in accordance with 15 U.S.C. § 1117(a); and

    c. Award statutory damages and attorneys' fees and costs under 15 U.S.C. § 1117.

2. Award the University damages for Colbert's breach of contract with the University, in an amount to be proven at trial.

3. Alternatively award damages for the value of benefits conferred on Colbert from her use of NeurOn Therapeutics, including equity or profits derived, in an amount to be proven at trial.

4. Award the University damages for Colbert's unfair competition under Florida common law, in an amount to be proven at trial.

5. Award damages for Defendant's negligent misrepresentations and material omissions, including lost revenues and reputational harm, in an amount to be determined at trial.

6. Directing such other relief as the Court may deem appropriate to prevent the public from deriving any erroneous impression that any good or service at issue in this case that has been created, advertised, marketed, promoted, supplied, distributed, offered for sale or sold by Colbert of the NeurOn Therapeutics mark and software, has been authorized by the University, or is related to or associated in any way with the University or its products and services.

7. Awarding the University pre- and post-judgment interest on any monetary award made part of the judgment against Colbert.

8. Awarding the University such additional and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The University hereby demands a jury trial on all issues so triable that are raised by this Complaint.

Respectfully submitted this 7th day of August 2025,

**ISICOFF RAGATZ**
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Tel.: (305) 373-3232
Fax: (305) 373-3233

By: /s/ Eric D. Isicoff
    Eric D. Isicoff
    Florida Bar No. 372201
    Isicoff@irlaw.com
    Teresa Ragatz
    Florida Bar No. 545170
    Ragatz@irlaw.com
    Isabel R. Jolicoeur
    Florida Bar No. 1015503
    Jolicoeur@irlaw.com